D. M. Steward Mfg. Co. *v.* Steward *et als.*

AND

Montague *et als. v.* Steward *et als.*

(*Knoxville.* September Term, 1902.)

1. **PATENTS.** Rights of inventor before issuance of patent.

The inventor of a new and useful improvement in a patentable article has no *exclusive* right to its use and manufacture until he obtains a patent therefor; and no suit can be maintained by the inventor against any one for its use, manufacture or sale until a patent has been obtained. (*Post,* pp. 301-302.)

Cases cited: Gayler *v.* Wilder, 10 How., 477, 493 (U. S.); Marsh *v.* Nichols, Shepard & Co., 128 U. S., 605, 612; Durham *v.* Seymour, 161 U. S., 235; Rein *v.* Clayton, 37 Fed. Rep., 354-458.

2. **SAME.** Use by employer o invention of employee—License presumed, when.

When a person, in the employment of another in a certain line of work, devises an improved method or instrument for doing that work, and uses the employer's property and the service of co-employees to develop his invention into practicable form, and assents to its use by his employer, he is presumed to have so far recognized the obligations of his service, and the benefits resulting to him from the use of the property, as to have given his employer an irrevocable license to use his invention. (*Post, pp.,* 305-306.)

Case cited: Solomon *v.* United States, 137 U. S., 342.

3. **SAME.** Same.

The employee, himself the owner of a patent, can not, without his employer's consent, and in the absence of a special arrangement for compensation, introduce his patented article

D. M. Steward Mfg. Co. v. Steward.

into the business of his employer and afterwards demand royalties, damages or profits from his employer for such use. (*Post, pp.* 306-307.)

Cases cited: Barry *v.* Crane (C. C.), 22 Fed. Rep., 396-7; Tube Works *v.* Bridgewater Iron Co. (C. C.), 26 Fed. Rep., 334; McClurg *v.* Kingsland, 1 How., 203; Gill *v.* United States, 160 U. S., 426; Manufacturing Co. *v.* Eustis, 51 N. J. Eq., 565.

4. **CORPORATION. Officers of, are trustees for cestui que trust.**

The officers and directors of a corporation occupy a position of trust, and will not be allowed to deal with the corporate funds and property for their individual gain. They will not be permitted to deal for the corporation and for themselves at the same time; and, as trustees, they will be held to account for all profits made by their use of corporate property and assets. (*Post, pp.* 303-305.)

Citing: Thompson on Corporations, secs. 4010-4022; Bank *v.* Downey, 53 Cal., 466 (31 Am. Rep., 62); Mallory *v.* Mallory-Wheeler Co., 61 Conn., 131.

5. **PATENTS. By corporate officers—Case in judgment.**

Defendant Steward, being the president and general manager of complainant manufacturing company, while in its employ invented useful and valuable gas tips, which he caused to be manufactured by complainant, without any contract for the payment of royalties; he directed an employee of the company to ascertain the exact cost of manufacture, to which he added one hundred and fifty per cent. as profit to complainant company, and then sold the tips to himself, doing business under another name, at cost and said profit added; he then placed the tips on the market at a price double that paid complainant company and realized large profits from sales so made. These transactions were without the knowledge or consent of the directors of complainant company, of whom defendant was the largest stockholder and the active and controlling manager. Suit by complainant for profits.

HELD: 1st. Defendant was not entitled to recover royalties on tips manufactured prior to the issuance of his patents. 2d. That defendant must account to complainant for all profits realized by him on the resale of the tips belonging

to complainant company and sold to himself at cost and one hundred and fifty per cent. added. (*Post, pp.* 290-307.)

---

FROM HAMILTON.

---

Appeal from Chancery Court of Hamilton County. T. M. McCONNELL, Chancellor.

PRITCHARD & SIZER, for Manufacturing Company and Montague.

BROWN & SPURLOCK, for D. M. Steward.

MR. JUSTICE MCALISTER delivered the opinion of the Court.

These consolidated causes are before the court on the appeal of the defendant, D. M. Steward. The only question now submitted for our determination is whether the said Steward is liable to the complainant corporation for certain profits made by him in the sale of acetylene gas burners, a mechanical contrivance invented by him while manager of said corporation, or whether the profits arising from said source were the individual property of Steward.

The original bill, filed June 15, 1899, alleged that from March 1, 1898, to March 1, 1899, large quantities of gas tips that were manufactured by the corporation had been turned over to the State Line Talc Company at prices ranging from $1.25 to $4 per gross;

that prior to March 1, 1898, the corporation had been receiving $9 per gross for these same tips, and the market price was the same from March 1, 1898, to March 1, 1899, and during this last period the corporation's burners had been sold for that price by D. M. Steward in the name of the State Line Talc Company; that the result of this conduct was that D. M. Steward had been selling to himself, and making a profit out of the goods of the corporation, which he should have made for the corporation itself.

The answer of defendant denied that D. M. Steward had turned over to the State Line Talc Company tips which previous to March, 1898, had been manufactured and sold by the corporation on its own account. On the contrary, it was averred that the corporation owned none of the patents covering acetylene gas tips, and that the tips it had made and sold for $9 per gross were covered by the patent of C. S. Steward, and that the directors of the corporation had recognized his claims, and agreed to pay him a royalty, leaving in reserve his right to an account for past infringements; that the tips made after March, 1898, and turned over to the State Line Talc Company, were tips which he had invented at his own expense, and after several years of experiment and failures, and that he had applied for patents on these inventions as follows: For the Acme, in March, 1898; for the Wonder, in December, 1898; that the claim for the first was still pending, but the second had been

allowed. It was admitted that there was a large profit in the sale of these tips, because they were the latest and best on the market, but it was denied that this profit belonged to complainants. It was also admitted that he had assigned his interest in said patents to the State Line Talc Company, and had assigned the business of the latter to his daughter, who carried it on; but all fraud in said assignments was denied, because the property was his own, to do with as he pleased.

On the 30th day of August, 1899, was filed an amended bill. In this amended bill it was alleged that the acetylene gas tips which the corporation had been selling for $9 prior to March 1, 1898, were like the tip covered by C. S. Steward's patent, but that in April, 1898, a controversy having arisen as to complainant's right to manufacture them, he had agreed to give the right for a royalty of $2 per gross. It is further averred that in March, 1898, D. M. Steward applied for patent on his Acme burner, and, some time after the arrangement had been made with C. S. Steward to manufacture his Bulb burner, D. M. Steward ceased manufacturing it, and took up the manufacture at complainant's factory of the Acme burner, but that, instead of selling this tip as the property of complainant, he paid it only $4 per gross for manufacturing it, and turned it over to be sold as the property of the State Line Talc Company, which sold them at $8 per gross. It is further averred that

the Wonder tip, on which he had applied for patent, was made and sold in the same manner.

It is further charged that the directors were not informed of these transactions; that no contract was made for the manufacture of tips by complainant for defendant, and, if D. M. Steward was entitled to any royalty, it should not exceed what the company had agreed to pay C. S. Steward under his patent. The reasons defendant was not entitled to any royalty from complainant for using the patents are then averred as follows: "But complainant shows further that both these alleged inventions were conceived and carried out while defendant, D. M. Steward, was in the employ of complainant, receiving a salary to manage its business, and under obligations to use his time and skill to advance its interests; that in developing his said inventions, and putting them in practical form, said defendant used complainant's material and machinery, the labor and skill of its employees, and his own time, which complainant paid him for, and that he has expressly assented to the use of said inventions by complainant. And not only has said defendant never given any notice to complainant's other directors or stockholders that he intended to charge a royalty for the use of said invention, but he expressly stated to one of complainant's directors shortly before March 1, 1898, that he would not do so, so long as he

should be a stockholder in complainant, and that complainant would make the tips under his invention.

In view of these facts, complainant is advised and charges that defendant Steward had no right, either in his own name, or in that of his daughter or the State Line Talc Company, to charge complainant anything for the use of his said inventions, at least so long as he continues to be a stockholder in complainant."

The bill further charged that for some reason the application for the Acme tip had been held up, and says: "If the application is rejected, defendant would, of course, have no right to charge any one for the use of his alleged invention."

In answer to this bill, defendant admits that D. M. Steward was the inventor of the two tips named, but he denies that they were invented at complainant's expense, or that he ever gave to complainant the use of his patents. It is averred that complainant manufactured these tips for the State Line Talc Company in the regular course of its business, and just as it did for others who owned patents for the same kind of tips, except that the profit allowed was much larger on this than in other contracts. The answer avers further that the complainant knew that the patent for the Acme tip would be issued, because he had already filed a letter showing allowance of all the essential claims.

The chancellor decreed that complainants were en-

D. M. Steward Mfg. Co. v. Steward.

titled to recover all the profits made by the State Line Talc Company for sale of the Acme and Wonder tips, less a reasonable royalty, which he fixed on the same basis as shown by the agreement with C. S. Steward, and less certain expenses of selling.

From this decree, both parties appealed. Complainant's assignment was "that the chancellor erred in adjudging and decreeing that defendant Steward was entitled to royalty on all or any burners or tips made by D. M. Steward Manufacturing Company in the forms covered by his inventions."

Defendant's assignment was (1) "that the chancellor erred in holding that complainants were entitled to the profits made in the sale of tips covered by the patents of D. M. Steward; (2) in assuming to impose on defendant a contract for royalty, and (3) in not decreeing that defendant paid complainant a fair and reasonable price for all that was due it."

The court of appeals held that complainants were entitled to all the profits made in the sale of the Acme and Wonder tips, reversing the chancellor even as to the allowance of a royalty.

Assignment of errors: "(1) The court erred in holding that complainants were entitled to the profit made by the defendant in the sale of his own inventions, notwithstanding the fact that more than a fair price had been paid for the manufacture of the goods."

The following facts were found by the court of chancery appeals: "Complainant, the D. M. Steward

Manufacturing Company, began business in Chatta-
nooga in 1889. Its business was to manufacture slate
pencils, a variety of crayons, gas tips, gas burners,
talc crayons and similar articles, with the usual
powers of such a corporation to sell its product. It
also manufactures gas tips on the orders of some
other concerns, charging them for the cost of manu-
facture and some profit besides."

The defendant, D. M. Steward, was the president
and general manager of complainant corporation. He
was its largest stockholder, its only salaried officer,
and the only person interested in it who had a prac-
tical knowledge of its business, the other stockholders
being all engaged in separate occupations, and devot-
ing no time to the affairs of complainant.

The business was wholly unfamiliar to the other
stockholders, and the result was that Mr. Steward,
for about ten years, was permitted to manage the
company pretty much as he saw proper, the directors
knowing little about the internal management, and
giving no attention to it, or practically none, except
to receive his report at meetings. For a long time
the company was in debt, and Mr. Steward indorsed
for it and otherwise nursed it, giving his whole time
and attention to it, until finally it became free of
debt.

About the year 1897 the use of acetylene gas for
lighting purposes had become quite general, and as
its use required a peculiar form of tip or burner,

different from the ordinary gas tip, the manufacture of such tips became a business of some importance and magnitude. At this time Clarence or C. S. Steward, a son of defendant D. M., was in the employ of complainant corporation, and some time prior to 1897 he invented or designed a form of burner for acetylene gas, on which he obtained a patent, and which was used by complainant in the manufacture of such burners for some time. So long as Clarence was connected with complainant company and in its employ, he was never paid and never demanded any royalty for the use of his invention by complainant; but in April, 1898, he left complainant's employ, and about June or July of that year he raised the contention that, as he was no longer connected with the company, they ought to pay him a royalty for the use of his patent. No particular attention seems to have been paid to his insistence in this regard until April, 1899, at which time an agreement was made between him and the directors of complainant corporation by which complainant was given the right to manufacture tips or burners in the form covered by his patent for a period of three months on payment to him of a royalty of $2 per gross on all tips so made. Under this contract complainant made about $7 per gross on the manufacture of this tip, the selling price being $9 per gross, and the royalty paid being $2 per gross.

During the time that Clarence was asserting his claim for royalty, and in connection with his claim,

D. M. Steward stated to Linus Llewellyn, the secretary and one of the stockholders of complainant corporation, that he had an acetylene gas tip 'in his mind,' which, when he had perfected the invention, he would use in the manufacture of tips by complainant, and that he would charge no royalty for its use so long as he was connected with complainant."

He applied for a patent on the Acme tip in March, 1898, and the patent was allowed on July 27, 1899. He applied for a patent on the Wonder tip December 8, 1898, and it was allowed July 25, 1899.

The court of appeals says: "In inventing the two tips above mentioned, the Acme and the Wonder, the work thereon was done by defendant at home and at night, except a small amount which he had done at complainant's factory, as shown by the books of the company, for all of which he was charged at the time; that about the time the inventions were perfected, and patents applied for, and before any tips or burners covered by said patents were manufactured for sale, D. M. Steward assigned his interest therein to the State Line Talc Company.

"This State Line Talc Company was a name under which D. M. Steward had been carrying on a talc mine for about ten years, and under which he transacted most of his private business, outside of his connection with complainant company, which had his name. In May, 1898, he made a transfer of this business to his daughter, Marie L. Steward. No fact is

stated or reason given to impeach this transfer, although it is stated that the State Line Talc Company continued to be but another name for his private business."

In June, 1898, D. M. Steward introduced the Acme tip, and later the Wonder tip, into the business of the complainant company, and this business soon displaced the manufacture of the Bulb tip, already referred to. "The Bulb tip," says the court, "sold fairly well, but was nothing like so popular as the Acme and Wonder tips subsequently proved to be."

The board of directors were not consulted about the manufacture of the Acme and Wonder tips by the defendant company. What was actually done is thus stated by the court of appeals: "He made the substitution in the following manner: He directed certain of the employees of the company to make an accurate estimate of the cost of manufacturing the new tips, and the cost of material entering into them. Upon this cost being so ascertained, first with regard to the Acme tip, he directed the bookkeeper of complainant to add one hundred and fifty per cent, as profit to the company. This resulted, under the arrangement, in an allowance of $4 per gross to the complainant company for the manufacture of the tips. That is to say, the arrangement, if a legal one, was that Mr. Steward employed the complainant company to manufacture his tips at $4 per gross, the tips,

when manufactured, to belong, not to the company, but to him.

The defect in this arrangement, viewed from the standpoint of contract, was that Mr. Steward was substantially contracting with himself, because he had the entire management of the business of the complainant company, and made the arrangement without consulting the board of directors or the stockholders.

As a part of this new plan of business, Mr. Steward had the entire product of tips, when so manufactured, delivered to himself under the business name of the State Line Talc Company, and under that name they were sold to the trade at $8 per gross, Mr. Steward thereby making $4 per gross on the product."

On these facts, the court of chancery appeals was of opinion that the defendant, Steward, should be held to account to complainant as a trustee, and he is liable for the entire proceeds of the sale of the tips, less, at the most, the expense of putting them on the market. On this basis that court held that defendant D. M. Steward should be charged with the amount the tips sold for, to-wit, $36,223.64; that he should be credited with tips returned, to-wit, $2,398.30, and with expense of selling the tips, to-wit, $2,099.32; and that a decree may be entered against him for this balance, with interest from August 31, 1899. The court declined to allow Steward any royalty for the use of his invention.

We do not think there is anything in the decree

of the court of chancery appeals of which the defend-
ant can justly complain.   Two controlling reasons
appear to us why defendant Steward should not be
allowed any compensation, as against complainant
company, for the use his invention.   In the first
place, the court of chancery appeals finds that the
tips involved in this litigation were all manufactured
prior to August 31, 1899, and that it is not clearly
proven that either of these patents was granted prior
to that date.   The court found that the Acme patent
was not issued until October 31, 1892, and the Won-
der was not granted any earlier.   It thus appears that
court specifically finds that, when defendant Steward
placed the two tips with the complainant company
for manufacture, they were not patented articles at
all, but were merely applications for patents then
pending, and that the letters patent were not issued
until after August 31, 1899, at which date the com-
pany ceased the manufacture of the tips.   It is well
settled that: "The inventor of a new and useful im-
provement certainly has no exclusive right to it until
he obtains a patent.   This right is created by the
patent, and no suit can be maintained by the inventor
against any one for using it before the patent is is-
sued.   .   .   .   It [the monopoly] is created by the
act of congress, and no rights can be acquired in it
unless authorized by statute, and in the manner the
statute prescribes."   *Gayler* v. *Wilder,* 10 How., 477,
493 (13 L. Ed., 504).

"The mere circumstances of inventing and constructing a machine could no more inhibit its imitation than would the structure or interior arrangement of a house of peculiar ingenuity or convenience prevent the like imitation by any one who could possess himself of its plan. The mere mental process of devising an invention enters not into the nature of property, according to the common law." Id., page 503; 10 How., 13 L. Ed., 504.

"Until the patent is issued, there is no property right in it; that is, no such right as the inventor can enforce. Until then there is no power over its use, which is one of the elements of a right of property in anything capable of ownership." *Marsh* v. *Nichols, Shepard & Co.,* 128 U. S., 605, 612 (9 Sup. Ct., 168, 170; 32 L. Ed., 538). And see, also, *Durham* v. *Seymour,* 161 U. S., 235 (16 Sup. Ct., 452; 40 L. Ed., 682).

"The effect of assuming cognizance of a patent before the patent is granted would be to extend the life of the patent beyond the seventeen years, by the time, which may be months and even years, during which the application is pending in the patent office." *Rein* v. *Clayton* (C. C.), 37 Fed., 354, 358 (3 L. R. A., 78).

There is no basis for an implied contract in this case that the complainant company would compensate defendant for the use of his contrivance, for the reason that at that time defendant had no exclusive property right in the invention, and hence there could

have been no appropriation of defendant's property to the company.

Again, we think it quite plain upon the facts disclosed herein that the profits derived from the sale of the tips belonged to the company, since they were made by its manager in the course of the business of the company, and from its material. We think it fundamental and axiomatic that the business manager of a corporation or partnership, selected to manage the company's business for the best interest of the partners or corporators, can not be permitted to contract with the corporation, and turn into his own pockets profits which legitimately belong to the corporators.

"Directors and officers of a corporation occupy a position of trust, and must act in the utmost good faith. They will not be allowed to deal with the corporate funds and property for their own private gain. They have no right to deal for themselves and for the corporation at the same time, and they must account for the profits made by the use of the company's assets, and for money made by a breach of trust." 3 Thomp. Corp., sec. 4010.

"The principle has a two-fold operation: If the contract is executed, and the director or other fiduciary has received the benefit, the law appropriates the benefit to the corporation or other *cestui que trust;* but, if the agreement remains executory, the law avoids it altogether." 3 Thomp. Corp., sec. 4022.

See, also, Id., secs. 4011, 4016, 4024, 4033, 4037, 4043, 4049.

"When a director of a bank loaned its money, and took from the borrower a note running to the bank for the amount loaned and interest, but at the same time, and as part of the same transaction, made an agreement that he should participate in the profits of a purchase and sale of certain lands, it was held that the profits thus contracted for belonged to the bank." *Bank* v. *Downey,* 53 Cal., 466 (31 Am. Rep., 62). See, also, *Mallory* v. *Mallory-Wheeler Co.,* 61 Conn., 131 (23 Atl., 708).

It is conceded in this case that the gas burners involved were made entirely at the expense of the complainant company. In the case of *Warehouse Co.* v. *Davis,* 81 Minn., 210 (83 N. W., 531), the question was under review. In that case "defendant was the managing agent of the plaintiff, which was a warehouse corporation engaged in the business of receiving, forwarding and selling grain, for which it received a certain commission. Defendant, while acting as such agent and manager of the corporation, bought for himself from two third parties certain grain stored in the warehouse of the corporation, and shipped and sold it at a profit. After allowing on the grain which is so purchased, the customary commission charged by plaintiff, his profits amounted to over $3,500. He gave no information to the other stockholders of these purchases in his own behalf, invested

no money in the enterprise, and used the name, credit, business connections, etc., of the plaintiff, without its knowledge or consent, in the conduct of these transactions. It was held that he was bound to pay over to the corporation all the profit which he had realized." The facts of the case at bar show that defendant, without authority of complainant company, took over to himself, at a price which he himself fixed, complainant's entire manufactured products, sold them at a net profit of $4 per gross, and appropriated the profits.

It is the contention of defendant that he was the owner of these manufactured tips, for the reason that he invented the mechanical contrivance, and that all complainants were entitled to was a reasonable profit for manufacturing the tips. It is not insisted that defendant had an express contract with his company that he should recover compensation for the use of his invention, and there is no principle of law that would raise such a contract by implication upon the facts found in this record.

In *Solomons* v. *United States,* 137 U. S., 342 (11 Sup. Ct., 88; 34 L. Ed., 667), the rule is thus stated: "When a person in the employ of another in a certain line of work devises an improved method or instrument for doing that work, and uses the property of his employer and the service of other employees to develop and put in practicable form his invention, and explicitly assents to the use by the employer of such invention, a court or jury trying the facts is warranted in find-

ing that he has so far recognized the obligations of service owing from his employment, and the benefits resulting from his use of the property, as to have given such employer an irrevocable license to use such invention."

And in *Lane & Bodley Co.* v. *Locke,* 150 U. S., 193 (14 Sup. Ct., 78; 37 L. Ed., 1049), it was held that such an agreement that the employer should have the use of the employee's invention might be implied, though not expressed.

"It can hardly be possible that an employee, himself the owner of a patent, can introduce this patented device into his employer's business without his employer's consent, and without a special agreement to pay him, and afterwards turn around and demand royalties or profits and damages from his employer for the use of such device, especially in a case like this, where the invention . . . has been developed and brought to a practical condition at the expense of his employer." *Barry* v. *Manufacturing Co.* (C. C.), 22 Fed., 396, 397.

"The inventor and patentee having supervised and directed the building of a machine for the defendant company, and while in its employ, under such circumstances, the defendant company may be said to have a license to use that particular machine." *American Tube Works* v. *Bridgewater Iron Co.* (C. C.), 26 Fed., 334. See, also, the following cases: *McClurg* v. *Kingsland,* 1 How., 202 (11 L. Ed., 102); *Gill* v.

D. M. Steward Mfg. Co. v. Steward.

*United States,* 160 U. S., 426 (16 Sup. Ct., 322 (40 L. Ed., 480) ; *Manufacturing Co.* v. *Eustis,* 51 N. J. Eq., 565 (27 Atl., 439).

We are entirely satisfied with the decree of the court of chancery appeals, and the same is affirmed, with costs.